TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
AMANDA B. ELBOGEN (Cal. Bar No. 332505)
COLIN S. SCOTT (Cal. Bar No. 318555)
Assistant United States Attorney
National Security Division
SCOTT LARA (Cal. Bar No. 296944)
Senior Counsel
Department of Justice
National Security Division
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-5748/3159
E-mail: Amanda.elbogen@usdoj.gov
Colin.scott@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WANYING ZHANG,<br>aka "Heather,"<br><br>Defendant. | No. 26-CR-00118-MRA<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR REVIEW OF ORDER SETTING DETENTION |

Plaintiff United States of America, by and through its counsel of record, the Attorney General, the First Assistant United States Attorney for the Central District of California, Assistant United States Attorneys Amanda Elbogen and Colin Scott, and Department of Justice National Security Division Attorney Scott Lara, hereby files its opposition to defendant WANYING ZHANG's application for review of

order setting detention. This opposition is based upon the attached memorandum of points and authorities, the attached exhibit, the complaint and attached affidavit filed in this case, the Indictment, the attached Declaration of Kevin Holt, the Pretrial Services Reports, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 13, 2026

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

/s/
AMANDA B. ELBOGEN
COLIN S. SCOTT
Assistant United States Attorneys

SCOTT LARA
Senior Counsel,
DOJ National Security Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant Wanying "Heather" Zhang is accused of working at the direction of a hostile foreign intelligence service on U.S. soil. Defendant now appeals Magistrate Judge Steve Kim's determination that no set of conditions could ensure her future appearance in court. Judge Kim's initial determination was correct. This Court should reject the application based on defendant's serious flight risk and danger to the community.

Defendant is charged with spying on the close relatives of a high-ranking Taiwanese official at the direction of intelligence operatives of the People's Republic of China ("PRC"). Her alleged surveillance on behalf of a foreign power, and her extensive use of tradecraft in doing so, make clear that she is trained in evading detection and is unlikely to adhere to conditions of release.

Additionally, she has powerful personal and political ties to China: her parents and siblings all live in the PRC, as do the PRC Officials who tasked her with spying in the U.S. Moreover, defendant's messages indicate that, even before these charges were made known to the defendant, she was considering moving to the PRC permanently. Defendant also has strong financial ties to the PRC, and has hundreds of thousands of dollars in bank accounts there.

Defendant's proposed bond package cannot mitigate the extreme risk of flight that she poses as a PRC intelligence asset. This Court should order her detention to ensure she faces trial.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Offense Conduct and Complaint

Per the complaint, on September 1, 2025, defendant surveilled the close family member of a high-level Taiwanese government official at the direction of a foreign power, the PRC. (Dkt No. 1 at 2.) Defendant, who is a real estate agent in Southern California, conducted this surveillance alongside a co-conspirator, who is also her romantic partner and is presently in China. Defendant was never registered as an agent of the PRC government. (Id. at 3.) Prior to her surveillance, defendant had two in-person meetings in China with an individual identified as "PRC Official 2" in the complaint, who tasked her with surveilling the Taiwanese government official's family. (Id. at 24, 29.)

On October 1, 2026, law enforcement received notice that the defendant had booked a one-way flight to Shanghai set to depart on Sunday, October 4, 2026. (Declaration of Kevin Holt (hereinafter "Holt Decl." at 2.)

On Saturday, October 3, law enforcement obtained a criminal complaint, signed by Magistrate Judge Steve Kim, charging defendant with acting as an unregistered agent of a foreign government within the United States. (Dkt. No. 1.) On October 4, law enforcement arrested defendant at the Los Angeles International Airport ("LAX") before she could board her flight to the PRC. (Holt Decl. at 2.)

### B. Initial Appearance on October 5, 2026

After defendant's arrest, the parties proceeded to an initial appearance on October 5, 2026, where defendant was informed of the charges. United States Probation and Pretrial Services ("USPPS") issued a report recommending detention due to risk of flight, based

on defendant's extensive ties to China and inconsistent statements to pretrial services regarding her financial assets, among other issues. The detention hearing was continued until October 7, 2026, to allow for defendant to retain counsel.

**C. Contested Detention Hearing on October 7, 2026**

On October 7, 2026, Magistrate Judge Steve Kim held a detention hearing. (Dkt. No. 18.) Ahead of the hearing, USPPS issued an updated pretrial services report and continued to recommend detention despite defendant's proposed bail package – the same package offered here.[1] Judge Kim ultimately found that "no condition or combination of conditions of release will reasonably assure the defendant's appearance as required." (Dkt. No. 18 at 3.) Judge Kim ordered defendant detained based upon her significant family ties to China, lack of candor surrounding her financial assets, and the weight of the evidence against her. (Id.) On October 9, 2026, defendant filed an application for reconsideration of Judge Kim's detention order. (Dkt. No. 21.)

**D. Indictment**

On October 9, 2026, the grand jury returned a two-count indictment, in case number 26-cr-00118-MRA, charging the defendant with conspiracy to act as an unregistered agent of a foreign government, and acting as an unregistered agent of a foreign government.

[1] Defendant has proposed a $100,000 appearance bond to be replaced within 30 days by full deeding of the family residence in Irvine, CA. Defendant has also proposed multiple affidavits of surety totaling $120,000.

### E. Defendant's iCloud and Seized Devices Reveal Evidence of Defendant's Double Life

On March 9, 2026, the government obtained a warrant, signed by the Honorable Charles Eick, Case No. 26-mj-1336, for the defendant's iCloud account. Law enforcement seized two devices from the defendant pursuant to her arrest at LAX. [2] The government's review of the defendant's iCloud and seized devices, which is ongoing, has revealed evidence of the plot to surveil the victims, and the extent of defendant's double life here in the United States.

Relevant to this motion, law enforcement reviewed messages in which the defendant indicated:

- She planned to move to China and start a business there;
- She had no return date set for her trip to China;
- She was in a long-term romantic relationship with Individual 1, who had taken a one-way flight to China two weeks prior.
- She had deleted her prior messages with PRC Official 2.

Holt Decl. at 2.

*Conversations about Relocating to China*

Defendant discussed with multiple people her desire to move to the PRC, even before learning of the charges against her. In June of 2025, defendant told a friend that she was "considering residing in Shanghai" and "traveling back and forth." (Ex. A at 9.) In August of 2025, defendant continued this conversation stating that she was "going to start some business in Shanghai" and that the "preparation is basically done this time; I will not starve if I come back to China." (Id.)

---

[2] On October 3, 2026, law enforcement obtained a search warrant from the Honorable Steve Kim, case number 26-mj-5784, for defendant's person, which permitted the seizure of these electronic devices.

In another conversation dated August 26, 2025, defendant told her mother that she intended to sell a property in the United States and buy a house in China. (Id. at 8.) Notably, defendant is already invested in a nightclub in China and has received at least $190,000 in Chinese bank accounts in 2024 and 2025 alone. (Holt Decl. at 3.)

In a conversation with an unknown individual, defendant said (regarding the trip that was prevented by her arrest) that she planned to be in China for at least a month, with no return date in mind. (Holt Decl. at 3.)

*Individual 1*

In a WeChat conversation from December 2025, defendant discussed her relationship with Individual 1 with an individual referred to as a "Teacher" in her contacts. During this conversation, defendant mentioned that Individual 1 had previously "lost 100 million of his secret stash" gambling, and relayed that she had once demanded "100 million cash"[3] from him. (Id. at 3.)

## III. LEGAL STANDARD

Although review of the magistrate court's detention orders is de novo, this Court "is not required to start over . . . and proceed as if the magistrate's decision and findings did not exist." United States v. Koenig, 912 F.2d 1190, 1192-93 (9th Cir. 1990). Pretrial detention of a defendant without bail is appropriate where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or

[3] It is unclear if defendant was referring to 100 million RMB (which is approximately $15 million), or $100 million.

a flight risk; it is not necessary to prove both. 18 U.S.C. § 3142(e); United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). "[T]he government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community." United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991) (citing Motamedi, 767 F.2d at 1406–07).

Under the Bail Reform Act, the court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics, including family and community ties and past criminal conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).

## IV. ARGUMENT

A defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is thus appropriate where a defendant is either a danger to the community or a flight risk. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). Here, the defendant is both.

### A. Defendant Is a Serious Flight Risk

The history and characteristics of this defendant indicate that she is a serious risk of flight.

First, defendant's activities as an unregistered agent for the PRC, "point strongly to the conclusion that [s]he could flee, evade capture, and circumvent even the most stringent pretrial conditions." United States v. Mallory, 268 F. Supp. 3d 854, 864-65 (E.D. Va. 2017) (finding there was no condition or combination of conditions that could reasonably assure an espionage defendant's appearance or the safety of the community, on the basis of his profession as a spy). The complaint is replete with examples of defendant's extensive use of tradecraft to evade detection, including her flying to multiple locations before arriving at her destination to surveil the Victim, and requiring Individual 1 to Airdrop the surveillance photos rather than texting them, so as to leave no digital trace of the exchange. These facts all point to defendant's training in espionage which heightens her risk of flight.

Defendant has extremely strong ties to the PRC government. She graduated first in her class from UIR, which, per public reporting cited in the complaint, is closely affiliated with the PRC's MSS, China's intelligence agency. (Holt Decl. at 4.) As detailed in the complaint, defendant was in regular communication with other UIR graduates who are now PRC government officials. Based on the nature of her relationships with PRC government officials, specifically, her status as an active asset of PRC intelligence, it is fair to surmise that should defendant want to flee before trial, she would have the PRC's backing. Moreover, the PRC a strong incentive to prevent the government from airing information that may embarrass the PRC at defendant's public trial. Accordingly, the PRC may independently decide to facilitate her flight from the United States. Simply put,

defendant's background as an agent of a foreign power poses an extreme flight risk that no amount of bail resources can alleviate.

Second, defendant has extremely strong personal ties to China. Her parents, brother, and sister all live there. Her long-term romantic partner, Individual 1, is currently in China, having flown there on a one-way ticket himself almost two weeks prior to her arrest. (Holt Decl. at 2.) In messages with friends, defendant wrote she was planning on moving to Shanghai and starting a business there. In one conversation, defendant confirmed she had taken steps toward the move, stating "The preparation is basically done this time; I will not starve if I come back to China." Additionally, prior to her arrest at LAX, defendant had messaged another individual stating she planned to be in China for at least a month, and that she "had no return date in mind." (Id.)

Defendant is also invested in a business in China, and has received hundreds of thousands of dollars into Chinese bank accounts. (Id. at 5.) Individual 1, her co-conspirator and romantic partner, is currently in China, where he owns multiple rental properties and has access to a steady stream of revenue. Messages obtained from defendant's iCloud indicate she believes Individual 1 has access to at least "100 million" in cash.

Additionally, the government has concerns about the defendant's lack of candor regarding her financial assets. As discussed during the hearing with Judge Kim, the defendant denied owning any properties other than her main residence. She did not tell the pretrial services office that she and her husband owned additional properties. However, her husband identified three additional properties in three additional cities that they own, though he could

not recall whose names were on the deeds themselves. Her unwillingness to identify assets that could be used to facilitate her flight from the district raises significant concern.

Although defendant has a nuclear family in the Central District of California, the strength of those ties are undercut by defendant's own statements and actions.

Given her deep connections, financial resources, and stated desire to live in the PRC, defendant does not have a strong reason to stay and face justice for her alleged crimes.

**B. Defendant Poses a Danger to the Community**

Defendant's work as an agent of a hostile foreign intelligence service poses a direct threat to the United States.[4]

Per the complaint, the defendant agreed to be a tool of a hostile foreign power within the United States to surveil the PRC's adversaries. Accordingly, her activity posed a direct danger to the Victims in this case as well as to the greater national security interests of the United States. See e.g. Mallory, 268 F. Supp. 3d at 866 (noting in the context of the disclosure of classified information that "defendant's skills in tradecraft all show that he poses a grave risk of endangering not only one person, but the U.S. itself.") As in Mallory, defendant's use of tradecraft, as detailed in the complaint, highlights and exacerbates that danger.

No bail resources could mitigate defendant's danger to the community in light of the severity of her charged offenses and ties to a foreign intelligence apparatus. See United States v. Hir, 517

---

[4] The previous PSR mentioned the existence of a video on the defendant's iCloud that indicated she was a danger to the community. The government now has reason to believe that this video does not depict the defendant.

F.3d 1081, 1085, 1094 (9th Cir. 2008) (affirming district court's denial of proposed $600,000 secured bail package based on risk defendant posed to the community); see also Rep. No. 225, 98th Congress, 1st Sess. 1983, 1984 U.S.C.A.N. 3182, 3198-99 (n.60) (Congress finding that "a defendant who is a danger to the community remains dangerous even if he has posted a substantial money bond").

Likewise, any proposed release conditions, including electronic monitoring, would all suffer from the "critical flaw" in that "they depend on [defendant]'s good faith compliance" in order to be effective. Hir, 517 F.3d at 1092 (citation omitted). In particular, "electronic monitoring does not prevent a defendant from committing crimes within the monitoring radius," Id. at 1092 n.11 (citation omitted), and ankle monitors can be removed. No pretrial services officer could intercede if defendant, with the assistance of the PRC government, made the decision to use its resources to extract her.

There are no conditions that could be imposed that would alleviate the danger to the community.

**V. CONCLUSION**

This Court should grant the government's request for detention.